**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| *v.* | |
| **KEVIN DOCKERY** | **NO. 23-068-KSM** |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                    **December 11, 2023**

Defendant Kevin Dockery was indicted by a grand jury on a single count of violating 18 U.S.C. § 922(g)(1), which forbids any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from "possess[ing] . . . any firearm or ammunition." (Doc. No. 1.) Before the Court is Dockery's motion to dismiss the indictment in which he argues that the Third Circuit's recent *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) renders § 922(g)(1) unconstitutional both on its face and as applied to him. (Doc. No. 20.) Dockery's arguments are without merit, and the Court denies the motion.

## I.    Factual Background

Dockery is certainly no stranger to the criminal justice system. Dockery's criminal record includes two separate felonies in federal court and numerous felonies and misdemeanors in Pennsylvania state court. (Doc. No. 21 at 2.)

First, on June 10, 1997, Dockery pled guilty in Pennsylvania state court to a litany of felony and misdemeanor charges including robbery (18 Pa. Cons. Stat. § 3701), criminal conspiracy to commit robbery (18 Pa. Cons. Stat. § 903), theft by unlawful taking (18 Pa. Cons. Stat. § 3921), simple assault (18 Pa. Cons. Stat. § 2701), carrying a firearm without a license (18 Pa. Cons. Stat. § 6106), possessing instruments of a crime (18 Pa. Cons. Stat. § 907), and

1

recklessly endangering another person (18 Pa. Cons. Stat. § 2705).  (*Id.*; Doc. No. 20 at 3.)  For these offenses, he was sentenced to six to twelve years in prison followed by three years of probation.  (Doc. No. 21 at 2.)

Then, on September 23, 2009, Dockery pled guilty in the Eastern District of Pennsylvania to possession with the intent to distribute controlled substances (cocaine) in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and aiding and abetting in violation of 18 U.S.C. § 2.  (Doc. No. 21 at 2; Doc. No. 20 at 3–4.)  He was sentenced to seven months imprisonment with five years of supervised release.  (Doc. No. 21 at 2.)

Finally, on June 18, 2019, also in the Eastern District of Pennsylvania, Dockery pled guilty to possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), the same provision that he is alleged to have violated in the case at bar.  (*Id.*)[1]  Dockery was sentenced to thirty-five months imprisonment followed by three years of supervised release. (*Id.*)

That brings us to the indictment at issue.  According to the Government, in the afternoon of December 6, 2022, while still on supervised release for his 2019 conviction, Dockery was seen by an investigator possessing a firearm on a live Instagram broadcast.  (*Id.* at 1.)  That same day, the police executed a search warrant for Dockery's residence and during the search, seized a Springfield XD subcompact 9mm firearm loaded with thirteen live 9mm rounds and a shoe box containing various 9mm and .40 caliber live rounds.  (*Id.* at 1–2.)

On February 16, 2023, Dockery was indicted by a federal grand jury.  (Doc. No. 1.)  The indictment read in relevant part that, despite having "been convicted in a court of the Commonwealth of Pennsylvania and the United States District Court for the Eastern District of

---

[1] Defendant's description of his prior offenses conspicuously omits any mention of this most recent conviction or that Defendant was on supervised release for this offense when found possessing a firearm. (Doc. No. 20 at 3–4 (asserting that Defendant only has one prior federal felony conviction, which occurred in 2009).)

Pennsylvania of a crime punishable by imprisonment for a term exceeding one year," Dockery

"knowingly possessed a firearm, that is, a Springfield Armory, model XD-9, 9mm Luger semi-

automatic pistol . . . loaded with 13 live rounds of 9mm Luger ammunition" in violation of 18

U.S.C. § 922(g)(1).  (*Id.*)

## II.    Applicable Law: The *Bruen* and *Range* Decisions

Dockery moves to dismiss his indictment, arguing that § 922(g)(1) violates his Second

Amendment right to bear arms.  The Second Amendment provides, in relevant part, that "the

right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  This

right, however, is "not unlimited."  *D.C. v. Heller*, 554 U.S. 570, 626 (2008).  Indeed, as the

Supreme Court outlined in *Heller*, "[f]rom Blackstone through the 19th-century cases,

commentators and courts routinely explained that the right was not a right to keep and carry any

weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.*  Instead, on

multiple occasions, the Supreme Court has outlined that the Second Amendment allows for a

"variety" of firearm regulations, including the "longstanding prohibitions on the possession of

firearms by felons."  *Id.* at 626, 636; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)

("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory

measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' . . . . We

repeat those assurances here.") (citation omitted).

The Supreme Court revisited the Second Amendment this past year in *New York State

Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).  In *Bruen*, the Supreme Court held

unconstitutional a New York statute requiring individuals to show that "proper cause" existed

before they would be provided an unrestricted license to carry a firearm outside of their home.

*Id.* at 2123, 2156.  In so deciding, the Court clarified the standard by which courts are to analyze

whether a firearm regulation is consistent with the Second Amendment.  Prior to *Bruen*, the Courts of Appeals "coalesced" around a "two-step" test that combined history with means-end scrutiny.  *Id.* at 2125.  Under this test, a firearms regulation was constitutional so long as the government showed either 1) that the conduct regulated was beyond the scope of the Second Amendment right as originally understood or 2) passed either intermediate or strict scrutiny, with the appropriate standard determined by whether the regulation burdened a "core" Second Amendment right.  *Id.* at 2126–27.  The Supreme Court held that this approach was "one step too many."  *Id.* at 2127.  Rejecting the means-end approach, the Court held that for a firearm regulation to be constitutional, the "government must affirmatively prove" that it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.*  In other words, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  *Id.* at 2131.

The Court noted that in some situations such an analysis "will be fairly straightforward," and that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Id.*  However, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Id.* at 2132.  In such situations, courts are instructed to "reason[ ] by analogy" and find that a "historical regulation is a proper analogue for a distinctly modern firearm regulation" only where "the two regulations are 'relevantly similar.'"  *Id.*  To determine whether regulations are sufficiently similar under the Second Amendment, the Court pointed to two metrics: the "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  Put another way, the "'central'

considerations" when conducting this analogical reasoning are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* The Court clarified that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (emphasis in original).

Given that the challenge in *Bruen* did not implicate § 922(g)(1), the majority opinion had no occasion to address the constitutionality of the statute. Nevertheless, six Justices (Roberts, Alito, Kavanaugh, Breyer, Sotomayor, and Kagan), through concurring and dissenting opinions, signaled their understanding that the majority opinion in *Bruen* did not call into question the constitutionality of § 922(g)(1). *See id.* at 2157 (Alito, J., concurring) (noting that the decision does not "disturb[ ] anything that [the Court] said in *Heller* . . . about restrictions that may be imposed on the carrying of guns"); *see also id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (emphasizing that "the Second Amendment allows a 'variety' of gun regulations," and that *Bruen* did not "cast doubt on longstanding prohibitions on the possession of firearms by felons" (citation omitted)); *id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor, and Kagan, JJ.) (explaining that "[l]ike Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding" that addressed presumptively lawful firearm restrictions, including the prohibition on the possession of a firearm by a felon).

Shortly after *Bruen*, the Third Circuit issued its *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), which Dockery now seeks to invoke. *Range* was a civil action brought by Bryan Range who sought a declaration that 18 U.S.C. § 922(g)(1) violated the Second Amendment only as applied to him, and an injunction prohibiting the law's enforcement

against him.  *Id.* at 98–99.  Twenty-eight years prior, Range had pled guilty to one count of making a false statement to obtain food stamps, in violation of 62 Pa. Cons. Stat. § 481(a).  *Id.* at 98.  In short, Range misrepresented how much money he earned when filling out a food stamp application at a time when he was supporting his wife and three children on $300 per week of income.  *Id.*  This conviction, although classified as a misdemeanor, was punishable by up to five years' imprisonment and thus Range was precluded from possessing a firearm under § 922(g)(1).  *Id.*  Range, however, desired a rifle and potentially a shotgun for hunting and self-defense.  *Id.* at 99.

The district court granted summary judgment to the Government, "faithfully applying" the then-controlling two-step analysis.  *Id.*  Range appealed and while his appeal was pending, the Supreme Court's opinion in *Bruen* was issued.  *Id.*  The Third Circuit panel permitted briefing on *Bruen*'s impact, but nevertheless affirmed the dismissal of Range's complaint, finding that the Government had "met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction 'places him outside the class of people traditionally entitled to Second Amendment rights.'"  *Id.* (quoting *Range v. Att'y Gen.*, 53 F.4th 262, 266 (3d Cir. 2022)).  The Third Circuit granted Range's petition for rehearing *en banc*.  *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2023).

The Third Circuit's *en banc* opinion reversed the panel, holding that § 922(g)(1) was unconstitutional as applied to Range.  *Range*, 69 F.4th at 98.  The court interpreted *Bruen*'s historical framework as requiring two steps:

> After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct.  If it does, the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

6

*Id.* at 101 (quoting *Bruen*, 142 S. Ct. at 2127) (citations omitted).  The court answered the first question in the affirmative, rejecting the Government's argument that the Second Amendment only covers "law-abiding, responsible citizens" and instead holding that Range, like all Americans, was one of "the people" guaranteed Second Amendment rights.  *Id.* at 101–03.  The court found the question of whether the Second Amendment covered Range's conduct to be an "easy question," holding that his request "to possess a rifle to hunt and a shotgun to defend himself at home" tracked the constitutional right.  *Id.* at 103.

Turning to the second step of the *Bruen* analysis, the court held that the Government had failed to meet its burden of demonstrating that the restriction set forth in § 922(g)(1), as applied to Range, was "consistent with the Nation's historical tradition of firearm regulation."  *Id.*  The court found the Government's reliance on language in *Heller* describing § 922(g)(1)'s prohibition as "longstanding" insufficient and held that the Government's invoked historical analogues were inapt.  *Id.* at 103–06.

Since the Government failed to carry its burden under the newly established *Bruen* framework, the court reversed the panel's prior decision.  *Id.* at 106.  But the court stressed that its holding was "a narrow one."  *Id.*  The majority emphasized that the Government had failed to show that "our Republic has a longstanding history and tradition of depriving *people like Range* of their firearms" and thus § 922(g)(1) was unconstitutional *as applied* to Range.  *Id.* (emphasis added).  Indeed, as made clear by Judge Ambro's concurrence, the majority's opinion did not "spell doom for § 922(g)(1)" or limit Congress's ability to disarm those "who pose a threat to the orderly functioning of society."  *Id.* at 109, 113 (Ambro, J., concurring); *see also United States v. Blackshear*, No. CR 23-159, 2023 WL 5985284, at *2 (E.D. Pa. Sept. 14, 2023) (noting that "*Range*'s holding was narrow and limited to the facts of that case, particularly the nature of

Bryan Range's previous conviction"). Instead, § 922(g)(1) remains "presumptively lawful." *Range*, 69 F.4th at 109–10 (Ambro, J., concurring) (quoting *Bruen*, 142 S. Ct. at 2162).

### III.   Dockery's Arguments Are Without Merit

Dockery argues that, applying *Range*, his indictment should be dismissed on four separate grounds: 1) § 922(g)(1) violates the Second Amendment as applied to him; 2) § 922(g)(1) violates the Second Amendment on its face; 3) § 922(g)(1) is unconstitutionally vague; and 4) § 922(g)(1) is an unconstitutional extension of Congress's Commerce Clause powers. Because the Court finds that none of these arguments have merit, it will deny Dockery's motion to dismiss his indictment.

### A.   Section 922(g)(1) is Constitutional as Applied to Dockery, A Violent Felon.

First, Dockery argues that § 922(g)(1) is unconstitutional as applied to him because his possession of a firearm "falls squarely within the heartland of the Second Amendment" and after *Range*, the Government is unable to meet its burden of showing that the application of § 922(g)(1) to him is consistent with the Nation's historical tradition of firearm regulation. (Doc. No. 20 at 5–10.) Applying the two-step *Bruen* analysis, the Court must first "decide whether the text of the Second Amendment applies to [Defendant] and his proposed conduct." *Range*, 69 F.4th at 101. If so, the Government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

At the first step, the Government correctly concedes that under *Range*, Dockery is among "the people" covered by the Second Amendment despite his prior felony convictions. (Doc. No. 21 at 6); *see Range*, 69 F.4th at 101–03 (holding that all citizens fall within the purview of the Second Amendment, not just those who are "law-abiding"). However, the Government argues that Dockery's *conduct* is not covered by the Second Amendment. (Doc. No. 21 at 6–9.) In

*Range*, the Third Circuit gave this portion of the analysis short shrift, deeming it an "easy question" and finding that Range's request "to possess a rifle to hunt and a shotgun to defend himself at home" tracked the constitutional right. *Range*, 69 F.4th at 103. Here, the Government argues that two facts complicate the analysis: 1) Unlike in *Range*, Dockery has not shown that he possessed a firearm for a lawful purpose; and 2) Dockery was on supervised release at the time that he was found possessing a firearm and thus had already forfeited his Second Amendment right. These arguments have some force. *See United States v. Terry*, No. 2:20-CR-43, 2023 WL 6049551, at *4 (W.D. Pa. Sept. 14, 2023) (finding that defendants failed the first step of the *Bruen* test because they were on probation and thus their conduct was not governed by the Second Amendment); *United States v. Jenkins*, No. CR 23-088, 2023 WL 6534200, at *6 (E.D. Pa. Oct. 6, 2023) ("[W]here a Section 922(g)(1) defendant cannot prove by a preponderance of the evidence that he was carrying a firearm for the purpose of self-defense—or other conduct expressly covered by the Second Amendment, such as hunting—the right to bear arms does not protect the defendant, and the indictment survives an as-applied challenge."). *But see United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311, at *9 (M.D. Pa. Sept. 1, 2023), appeal docketed, No. 23-2604 (3d Cir. Sep. 6, 2023) (rejecting argument that the Second Amendment didn't cover defendant where he possessed gun while on probation/parole). But because the Court finds below that the Government has met its burden at the second step, it need not address these issues and will assume that the Second Amendment covers Dockery's conduct without so deciding.[2]

---

[2] The Government also argues that *Range* was wrongly decided. (Doc. No. 21 at 3.) Because the Court is bound by Third Circuit precedent and the Government makes clear that it includes this argument solely for preservation purposes, the Court will not address it. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532, 544 (E.D. Pa. 2019) ("The district court is the lowest court in our federal hierarchical system and is bound by rulings of its circuit court and the Supreme Court.").

Turning to the second step of the *Bruen* analysis, the Court must determine whether the Government has shown that § 922(g)(1) as applied to Dockery "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.  As previously discussed, the Supreme Court in *Bruen* provided that this historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).  In identifying a historical analogue, the Court in *Bruen* warned that "not all history is created equal." *Id.* at 2136.  Because the Second Amendment codified a "pre-existing right," "English history dating from the late 1600s, along with American colonial views leading up to the founding" are relevant to identifying the scope of the right. *Range*, 69 F.4th at 106 (Krause, J., dissenting) (quoting *Bruen*, 142 S. Ct. at 2127).

As an initial matter, the Court rejects Dockery's argument that *Range* dictates the dismissal of his indictment because the Third Circuit rejected "all the historical evidence that has been relied on by the government in other post-*Bruen* litigation to date."  (Doc. No. 20 at 8.) While it is true that in *Range* the Third Circuit held that the Government failed to establish "a longstanding history and tradition of depriving people *like Range* of their firearms," Dockery is demonstrably not "like Range." *Range*, 69 F.4th at 106 (emphasis added).  The most significant distinguishing fact is that Dockery's prior convictions have placed him in a group of individuals who have "demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).  Dockery was first convicted of, among numerous other things, the quintessentially violent and dangerous crime of robbery.  (Doc. No. 21 at 2.) *See United States v. Hendricks*, No. 3:22-CR-397, 2023 WL 6276681, at *3 (M.D. Pa. Sept. 26, 2023) (describing robbery as "a

violent crime" and noting that it presents "a clear example of those persons who are both not to be trusted by society and are considered dangerous"); *see also Range*, 69 F.4th at 111–112 ("Society is protecting itself by disarming, inter alia, those who murder, *rob*, possess child porn, and leak classified national security information . . . .") (Ambro, J., concurring) (emphasis added).  He was convicted again years later of another dangerous felony, this time a federal drug trafficking offense. *See United States v. Reichenbach*, No. 4:22-CR-00057, 2023 WL 5916467, at *8 (M.D. Pa. Sept. 11, 2023) (noting that guns and drugs are a "dangerous combination," and drug-traffickers are "dangerous and disruptive to society.") (quoting *Muscarello v. United States*, 524 U.S. 125, 132 (1998)); *Blackshear*, 2023 WL 5985284, at *3 (noting that "[d]rugs and guns are a 'dangerous combination'" and that the defendants prior drug trafficking convictions suggested that he posed "a danger to society"); *United States v. Mosqueda*, No. CR 16-233, 2017 WL 5157847, at *4 (W.D. Pa. Nov. 7, 2017) ("The combination of drugs and guns constitutes a very serious danger to the community.").  And most recently, Dockery was convicted of illegal possession of a firearm in violation of § 922(g)(1), the very provision he is charged with here. While perhaps not quite as severe as his prior offenses, this conviction "demonstrates, at the very least, that he has a history of disobeying firearm regulations specifically designed to protect public safety." *United States v. Cotton*, No. CR 22-471, 2023 WL 6465836, at *4 (E.D. Pa. Oct. 4, 2023); *see also United States v. Harrison*, No. 2:23-CR-129-23, 2023 WL 6795588, at *5 (W.D. Pa. Oct. 13, 2023) (noting that prior conviction under § 922(g) demonstrates "a propensity toward illegally possessing firearms").

 The only commonality between Dockery and Range is that Dockery's robbery conviction is twenty-six years old whereas Range's conviction for making a false statement was twenty-eight years old.  (Doc. No. 20 at 3.)  But this is not sufficient.  Not only are the offenses

11

drastically different in nature, but the Court cannot ignore the stark contrast between the two individuals' criminal histories. *See United States v. Gauthney*, No. CR 22-0028, 2023 WL 7311179, at *1 n.1 (E.D. Pa. Nov. 6, 2023) (noting that among other things, the Third Circuit in *Range* considered "Range's subsequent law-abiding lifestyle"); *United States v. Davis*, No. 3:23-CR-60, 2023 WL 6810249, at *6 (M.D. Pa. Oct. 16, 2023) (noting the same). While Range never found himself convicted of another criminal offense, as discussed above, Dockery was imprisoned on two more occasions for dangerous felonies, the most recent of which was just four years ago in 2019. In fact, Dockery was on supervised release for this 2019 conviction and serving a ninety-day confinement sentence for violating the conditions of his supervised release when found possessing a firearm. (Doc. No. 21 at 2, 8.) Thus, notwithstanding this one overlapping fact, the Court finds that Dockery's several prior felonies are a far cry from Range's singular, twenty-eight-year-old misdemeanor conviction for making a false statement on a food stamps application to help his struggling family. The Government's failure to carry its burden with respect to non-violent individuals like Range suggests little about its ability to do so here where a dangerous felon is at issue. *See United States v. O'Connor*, No. CR 03-134, 2023 WL 5542087, at *3 (W.D. Pa. Aug. 29, 2023) (suggesting that in *Range*, the Third Circuit held that the government had failed to meet its burden "in light of [Range's] non-violent conviction"). Indeed, along with suggesting that its holding was "narrow," the court in *Range* specifically stated that it was not deciding the issue of whether § 922(g)(1) is constitutional as applied to dangerous felons. *Range*, 69 F.4th at 104 n.9; *see also Jenkins*, 2023 WL 6534200, at *13 (noting that "*Range* did not dispute the strength or validity of th[e] historical record" of disarming dangerous individuals but rather "just found that record inapplicable in the case before it").

Rather than relying solely on the Third Circuit's analysis in *Range*, this Court must independently determine whether the Government has presented a sufficient historical basis for disarming dangerous felons like Dockery. The Court finds that the Government has met this burden. Turning first to the pre-founding era, a timeframe the Supreme Court has found enlightening regarding the scope of the Second Amendment, the Government has put forth evidence that individuals who posed a potential danger to others were frequently disarmed. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety."). Such restrictions date back to England, from whom we "inherited" our right to bear arms. *Heller*, 554 U.S. at 599. For example, a 17th century English statute allowed the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13.

Numerous colonies and states followed their English predecessors in disarming those who they deemed dangerous either because of their violent acts or their disloyalty. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who posed a danger to others. Violence was one ground for fearing danger, as were disloyalty and rebellion."); *United States v. Jackson*, 69 F.4th 495, 502–04 (8th Cir. 2023) (collecting instances in which colonial American legislatures permitted the disarmament of individuals); *cf. Range*, 69 F.4th at 120–28 (Krause, J., dissenting) (providing a thorough examination of legislation and statutes that existed from the time of the English Restoration to the ratification of the U.S. Constitution that disarmed former felons). For example, a colonial New Hampshire statute permitted "affrayers, rioters, disturbers or breakers

of the peace" to have their "arms or weapons" taken away.  Act for the Punishing Criminal

Offenders, 1696-1701 N.H. Laws 15; *see also* Act for the Punishment of Criminal Offenders,

1692-93, ch. 18, § 6 *reprinted in* 1 The Acts and Resolves, Public and Private, of the Province of

the Massachusetts Bay 52–53 (1869) (providing the same).  Similarly, in March of 1776, the

Continental Congress recommended that states disarm individuals who were "notoriously

disaffected to the cause of America" or who "refuse[d] to associate, to defend, by arms the

United American Colonies, against the hostile attempts of the British fleets and armies."  4

Journals of the Continental Congress 1774–1789, at 205 (1906).  Massachusetts acted on this

advice, shortly thereafter passing a law permitting the disarmament of individuals who refused to

declare loyalty to the United States.  Act of May 1, 1776, ch. 21, § 1, *reprinted in* 5 The Acts and

Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886).  Numerous

other states, such as Pennsylvania, North Carolina, and Virginia, followed suit and passed similar

laws providing for the confiscation of weapons owned by persons refusing to swear an oath of

allegiance to the state or the United States.  *See* Act of June 13, 1777, ch. 756, §§ 2–4, *reprinted

in* 9 The Statutes at Large of Pennsylvania from 1682–1801 at 110–13 (William Stanley Ray ed.,

1903); *Reichenbach*, 2023 WL 5916467, at *7 (citing 24 The State Records of North Carolina 89

(Walter Clark ed. 1905); 9 William Waller Hening, The Statutes at Large; a Collection of all the

Laws of Virginia 282 (1821)).  And an early New Jersey statute allowed the government to

disarm any individual that it judged "disaffected and dangerous to the present Government."  Act

for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90.

  As the Government argues, precursors to the Second Amendment further support the

assertion that the founding generation permitted the disarmament of dangerous individuals.

During the Pennsylvania ratifying convention, a "highly influential" minority proposal, *Heller*,

554 U.S. at 604, stated that "no law shall be passed for disarming the people or any of them

unless for crimes committed, or *real danger of public injury from individuals*."  2 Bernard

Schwartz, The Bill of Rights: A Documentary History 665 (1971) (quoting The Address and

Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their

Constituents, 1787) (emphasis added).  Similarly, a proposal at the Massachusetts constitutional

ratifying convention provided that Congress may not "prevent the people of the United States,

who are *peaceable citizens*, from keeping their own arms."  *Id.* at 681 (emphasis added).

This disarmament of individuals who were deemed dangerous continued post-ratification

and through the Reconstruction era.[3]  For example, a federal Reconstruction order applicable to

South Carolina provided that "no disorderly person, vagrant, or disturber of the peace, shall be

allowed to bear arms."  Cong. Globe, 39th Cong., 1st Sess. 908–09 (1866).  Further, as discussed

in Judge Ambro's concurrence in *Range*, numerous states disarmed "tramps" whereas other

states prohibited individuals who were "not engaged in any legitimate business" or had "ever

borne arms against the government of the United States" from possessing a firearm.  *Range*, 69

F.4th at 112 (quoting 2 General Statutes of the State of Kansas 353 (1897)).

Utilizing the "why" and "how" metrics set forth by the Supreme Court in *Bruen*, it is

clear that these statutes present apt analogues to § 922(g)(1)'s restrictions on Dockery's Second

Amendment right to bear arms.[4]  Turning first to the "why" metric, while these various historical

---

[3] While the Court in *Bruen* emphasized that earlier historical evidence is particularly enlightening as to the scope of the Second Amendment, they also made clear that evidence from the Reconstruction era was relevant at the very least as "confirmation of what the Court thought had already been established" through older laws.  *Bruen*, 142 S. Ct. at 2137; *cf. Range*, 69 F.4th at 112 (Ambro, J., concurring) ("[T]he Supreme Court has not yet decided whether individual rights are defined by their public understanding at the time of the ratification of the Bill of Rights in 1791 or the Fourteenth Amendment in 1868.").

[4] Defendant argues that because § 922(g)(1) does not address a problem that was "unimaginable at the founding" the Government is required to show a "*distinctly* similar" historical analogue as opposed to a "relevantly similar" analogue.  (Doc. No. 20 at 8 (emphasis in original).)  Defendant is correct that

statutes have somewhat different language, targets, and impact, the common thread is that they were all efforts to disarm groups that "lawmakers deemed dangerous and disruptive to society" in an attempt to protect "the public from violence and disorder." *Reichenbach*, 2023 WL 5916467, at *7. Here too disarming individuals like Dockery, who have shown a proclivity toward violence and an inability to safely hold firearms, serves the purpose of protecting the public from unnecessary danger and disruption. Similarly, the "how" metric suggests that these statutes are closely aligned: both these historical statutes and § 922(g)(1) reflect a decision from lawmakers that disarming dangerous individuals was an appropriate means to ensure public safety. Accordingly, § 922(g)(1), as applied to Dockery, is sufficiently analogous to the historical practices of firearm regulation, and the Government has met its burden under *Range* and *Bruen*.

Dockery asks this Court to find these historical analogues inadequate based on the reasoning set forth in *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) and *United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023). (Doc. No. 20 at 9–10.) In these opinions, which largely mirror each other, the court found that § 922(g)(1) was unconstitutional as applied to two former felons, one with multiple drug trafficking convictions and the other with both drug trafficking and armed robbery convictions. But the Court is not persuaded by the reasoning set forth in these opinions, which

---

"[r]egulations targeting longstanding problems must be 'distinctly similar' to a historical analogue," *Range*, 69 F.4th at 103, whereas a modern regulation that was "unimaginable at the founding" need only be "relevantly similar." *Bruen*, 142 S. Ct. at 2132–33. However, neither test requires a "historical twin." *Jenkins*, 2023 WL 6534200, at *3. Because the Court finds that the Government has met its burden regardless of which standard is applied, it need not address which test is appropriate.

are both non-binding and contrary to nearly every post-*Range* opinion in this Circuit.[5]  The court

in both *Quailes* and *Harper* found that the Government had failed to carry its burden under

*Bruen* because it had "not provided the court with a basis to determine whether the mechanics

and purpose of the historical regulations disarming those deemed 'dangerous' are similar to the

mechanics and purpose of Section 922(g)(1)."  *See Quailes*, 2023 WL 5401733, at \*12; *Harper*,

2023 WL 5672311, at \*13.  Put more precisely, the court held that the Government failed to

demonstrate that the "how" and "why" of their historical analogues and § 922(g)(1) were aligned

because it had not provided the "purpose of the historical regulations," "the length of time the

individuals were disarmed; whether a conviction was required or any other information about

how the dangerousness determination was made; or what kind of offenses qualified as

dangerous."  *See Quailes*, 2023 WL 5401733, at \*12; *Harper*, 2023 WL 5672311, at \*13.  Here,

however, as noted above, the Court finds that these metrics suggest a close alignment between

---

[5] *See, e.g.*, *Blackshear*, 2023 WL 5985284 (Pappert, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with multiple felony drug and firearm convictions based on *Heller* and the history of disarming dangerous individuals); *United States v. Ames*, No. 23-178, 2023 WL 5538073 (E.D. Pa. Aug. 28, 2023) (Kenney, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony robbery and firearm convictions based on *Heller*'s "presumptively lawful" holding and historical analogues); *United States v. Minter*, No. 22-155, 2023 WL 6051265 (M.D. Pa. Sept. 15, 2023) (Mariani, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony drug convictions based on *Heller* and historical statutes disarming individuals "deemed dangerous, untrustworthy, or unlikely to abide by the law"); *Reichenbach*, 2023 WL 5916467 (Brann, C.J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony drug convictions based on historical prohibitions which were sufficiently analogous to § 922(g)(1) prohibiting drug traffickers from possessing firearms); *United States v. Wise*, No. CR 21-511, 2023 WL 6260038 (W.D. Pa. Sept. 26, 2023) (Hardy, J.) (denying as-applied and facial challenges to § 922(g)(1) based on historical analogues which "disarmed individuals who were deemed to be dangerous, untrustworthy, or a threat to the orderly functioning of society"); *Cotton*, 2023 WL 6465836 (Pratter, J.) (denying as-applied challenge to § 922(g)(1) based on historical analogues disarming individuals who "posed a potential danger"); *United States v. Ladson*, No. CR 23-161-1, 2023 WL 6810095 (E.D. Pa. Oct. 16, 2023) (Baylson, J.) (denying as-applied challenge to § 922(g)(1) based on government identifying "numerous historical analogues establishing that the Second Amendment permits the disarmament of those who, like Defendant, are 'dangerous to the Peace'"); *United States v. Green*, No. CR 22-387, 2023 WL 6164407 (E.D. Pa. Sept. 21, 2023) (Diamond, J.) (rejecting facial and as-applied challenges to § 922(g)(1) based on *Heller* and historical analogues).

the expansive historical record presented by the Government and § 922(g)(1): both reflect a decision by lawmakers to disarm individuals who through their past or present actions have demonstrated that they are dangerous and disruptive to society.  While the court in *Quailes* and *Harper* suggested that the Government's comparisons were "too broad" and demanded additional information connecting these historical statutes, *Harper*, 2023 WL 5672311, at *13, the Court is mindful of the Supreme Court's directive that the Government need not present a "historical twin" to meet their burden, *Bruen*, 142 S. Ct. at 2133.  Thus, as numerous other courts have before, the Court refuses follow these two outlier opinions and finds that the Government has met its burden.  *See Reichenbach*, 2023 WL 5916467, at *10 n.93 (noting that the court would depart from *Quailes* and finding that unlike in *Quailes* the Government had demonstrated that "such a prohibition is consistent with the United States' historical tradition of firearm regulation"); *United States v. Pearson*, No. CR 22-271, 2023 WL 6216527, at *3 (E.D. Pa. Sept. 25, 2023) ("We are mindful of two recent decisions (now on appeal) [*Harper* and *Quailes*] finding section 922(g)(1) unconstitutional as applied to persons with earlier convictions for possessing narcotics with intent to distribute.  We are not persuaded by the reasoning in those decisions given the presumptively lawful regulatory measures enacted by Congress in section 922(g)(1)."); *United States v. Santiago*, No. 5:23-CR-00148, 2023 WL 7167859, at *4 n.8 (E.D. Pa. Oct. 31, 2023) ("[T]his Court is not persuaded by the reasoning in [*Harper* and *Quailes*]."); *United States v. Woznichak*, No. CR 21-242, 2023 WL 7324442, at *5 n.9 (W.D. Pa. Nov. 7, 2023) ("This Court is neither persuaded, nor bound, by *Harper*.").[6]

---

[6] Dockery also cites to *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023), an out-of-circuit opinion that found § 922(g)(1) unconstitutional as applied to an individual who was convicted in 1992 of aggravated assault and manslaughter.  (Doc. No. 20 at 10.)  Not only is this opinion not binding, but its reasoning is distinguishable from the case at bar.  First, the court in *Bullock* discredited the Supreme Court's statement in *Heller* that prohibitions on the possession of

In sum, Dockery asks this Court to disregard the Third Circuit's warning that *Range* was a "narrow" opinion and instead read it to permit even those individuals who have demonstrated a proclivity toward violence and drug trafficking an unwavering right to bear arms. This the Court cannot do. Instead, given the scads of historical examples of lawmakers disarming those who they believed posed a potential danger to society, "this Court heeds—as it must—the wisdom of our Nation's founding generation, which demonstrated through early American legislation that the right to bear arms must by necessity yield to the need to safeguard the Country's citizens." *Reichenbach*, 2023 WL 5916467, at *10.

### B. Section 922(g)(1) is Constitutional on its Face.

Dockery also argues that § 922(g)(1) is facially unconstitutional because there is "no founding-era history of disarming people convicted of felonies at all." (Doc. No. 20 at 11.) To succeed on a facial challenge, *Dockery* "must establish that no set of circumstances exists under which [§ 922(g)(1)] would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011); *see also Blackshear*, 2023 WL 5985284, at *3 (applying this principle in the context of a facial challenge to § 922(g)(1)). Under this exacting standard, Dockery's argument fails for a panoply of reasons.

First, as set forth above, there is historical evidence from the founding era and beyond that supports the disarming of dangerous individuals. *See supra* at 13–16. And since Dockery

---

firearms by felons is "presumptively lawful," finding it to be non-binding dicta. *Id.* at *18. While that may be the case under Fifth Circuit precedent, the Third Circuit has made clear that this language from *Heller* is binding. *See United States v. Barton*, 633 F.3d 168, 171 (3d Cir. 2011). Further, the court in *Bullock* found that the Government had failed to present even a single historical example disarming individuals like the defendant there. *Bullock*, 2023 WL 4232309, at *29-31. A review of the briefing in that case confirms the court's assertion. Here, on the other hand, the Government has presented a record "replete with firearm regulations applying to those who pose a danger to their brethren, a record spanning from before the very first colonists even landed in Jamestown to our Nation shedding its shackles from Great Britain." *Cotton*, 2023 WL 6465836, at *1. The Court therefore refuses to adopt the reasoning set forth in *Bullock* and finds that the Government has carried its burden under *Bruen*.

cannot show that § 922(g)(1) is unconstitutional even as applied to him, he has failed to demonstrate that there are no circumstances in which the statute will be constitutional.  This forecloses any facial challenge.  *See Blackshear*, 2023 WL 5985284, at *3 (rejecting facial challenge to § 922(g)(1) where Defendant failed to show that the statute "is unconstitutional as applied to his case, let alone in all circumstances.").

Second, the Supreme Court has signaled that § 922(g)(1) remains constitutional after *Bruen*.  In *Heller* and *McDonald*, the Supreme Court held that the "longstanding prohibitions on the possession of firearms by felons" is "presumptively lawful."  *Heller*, 554 U.S. at 626–27 & n.26; *McDonald*, 561 U.S. at 786.  This language was not dicta, *Barton*, 633 F.3d at 171, and nothing in the Court's most recent opinion in *Bruen* suggests that this holding from *Heller* and *McDonald* is no longer good law, *see United States v. Morales*, No. 3:22-CR-161, 2023 WL 6276672, at *3 (M.D. Pa. Sept. 26, 2023) ("*Bruen* did not invalidate, alter, or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, but instead, relying extensively on those two cases, clarified the appropriate test that must be applied in addressing Second Amendment challenges to firearms regulations.").  To the contrary, as indicated earlier, six of the Justices, through concurring and dissenting opinions, signaled their view that § 922(g)(1) is constitutional even after *Bruen*.  *See supra* at 5.  Thus, this Court, bound by the Supreme Court's statement in *Heller* and *McDonald*, finds that § 922(g)(1) is a facially constitutional restriction on an individual's Second Amendment right.

The Third Circuit's opinion in *Range* does not, and could not for that matter, mandate a different result.  Instead, the Court takes the Third Circuit at its word that the opinion was "narrow" and only held § 922(g)(1) unconstitutional as applied to those "like Range."  *Range*, 69 F.4th at 106.  The Court agrees with Judge Ambro that *Range* did not "spell doom" for

§ 922(g)(1) more generally and that the statute remains "presumptively lawful." *Id.* at 109

(Ambro, J., concurring); *see also id.* at 110 (outlining that *Range* "speaks only to [Range's]

situation, and not to those of murderers, thieves, sex offenders, domestic abusers, and the like");

*Terry*, 2023 WL 6049551, at *5 ("Nothing in *Range* suggests that the Third Circuit meant to

declare § 922(g)(1) unconstitutional in all circumstances.  Quite the opposite."); *O'Connor*, 2023

WL 5542087, at *2 ("The decision in *Range* did not undermine the constitutionality of

§ 922(g)(1) in all situations.").[7]

Finally, as noted above, nearly every opinion in this Circuit addressing this issue after

*Range* has held that § 922(g)(1) is constitutional both on its face and as applied.  *See supra* at 17

n.5.  While these opinions are not binding, this trend undermines any attempt by Dockery to

show that § 922(g)(1) is unconstitutional in every application.

Since Dockery has failed to show that § 922(g)(1) is unconstitutional in all

circumstances, or even in his own case for that matter, the Court finds § 922(g)(1) constitutional

on its face.[8]

---

[7] Dockery argues in connection with his as-applied challenge that the Government cannot rely on this statement in *Heller* because the Third Circuit in *Range* found it insufficient to carry the Government's burden, (Doc. No. 20 at 8–9 (citing *Range*, 69 F.4th at 103–04)), and because the Supreme Court "did not actually cite any 'longstanding prohibitions'" when making this statement, (Doc. No. 20 at 9 (quoting *Quailes*, 2023 WL 5401733, at *10)).  While this language in *Heller* and *McDonald* may not have been by itself sufficient to carry the Government's burden for an as-applied challenge in *Range*, the Court finds the Supreme Court's views on the constitutionality of felon-in-possession statutes highly relevant to Dockery's assertion that § 922(g)(1) is unconstitutional in every instance.  *See Reichenbach*, 2023 WL 5916467, at *5 (rejecting a facial challenge to § 922(g)(1) and noting that "[t]he statements in *Heller* and *McDonald* that § 922(g)(1) remains presumptively lawful are not dicta and are binding upon this Court" and that "at least five sitting Justices on the Supreme Court . . . are unwilling to strike down § 922(g)(1) as facially unconstitutional"); *Ladson*, 2023 WL 6810095, at *5 (finding defendant's facial challenge foreclosed by the Supreme Court's statement that "felon bans are presumptively lawful").

[8] The Government also argues that § 922(g)(1) is constitutional on its face because in the founding generation, many felonies were punishable by death, exposing individuals to "far more severe consequences than disarmament."  (Doc. No. 21 at 21.)  However, the Third Circuit explicitly rejected this argument in *Range*, finding the Government's invocation of historical statutes that subjected

### C.  Section 922(g)(1) is Not Unconstitutionally Vague.

Dockery further argues that § 922(g)(1) is unconstitutionally vague.  He asserts that "[a]fter *Range*, Section 922(g)(1) can no longer criminalize much of the conduct it purports to outlaw" and thus fails to "give ordinary people fair warning about what the law demands of them." (Doc. No. 20 at 12 (quoting *United States v. Davis*, 139 S. 2319, 2323 (2019)).)

The Court finds this argument unpersuasive.  A law is unconstitutionally vague only where it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. 285, 304 (2008) (citations omitted).  Section 922(g)(1) does not run afoul of this principle because it "provides explicit notice that it bars the possession of a firearm by any person who has previously been convicted of a crime punishable by more than a year in prison (or of certain misdemeanors as specifically defined)." *Blackshear*, 2023 WL 5985284, at *3. That the Third Circuit held that § 922(g)(1) was unconstitutional when applied to the particular facts presented in *Range* does little to undermine the clear directive set forth in the statute.  *See United States v. Williams*, 553 U.S. 285, 305 (2008) (noting that "the mere fact that close cases can be envisioned" does not render a statute vague).  Further, any confusion regarding the scope of the statute following *Range* is undermined by the near unanimous treatment of the issue in this Circuit following the Third Circuit's *en banc* opinion.  *See supra* at 17 n.5.  The Court thus finds that § 922(g)(1) is not unconstitutionally vague.

---

individuals to more severe punishments did not suggest that "the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition."  *Range*, 69 F.4th at 105.

**D.  Section 922(g)(1) is Not an Unconstitutional Extension of Congress's Commerce Clause Powers.**

Grasping for straws, Dockery finally asserts that § 922(g)(1) is inconsistent with the original public meaning of the Commerce Clause.  (Doc. No. 20 at 13.)  But, as Dockery acknowledges, binding precedent "continue[s] to foreclose this Court from second-guessing . . . Congress's power to regulate commerce."  (*Id.* (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937)); *see also United States v. Singletary*, 268 F.3d 196, 204–05 (3d Cir. 2001) (holding that § 922(g)(1) does not lie beyond Congress's Commerce Clause powers); *United States v. Gateward*, 84 F.3d 670, 671–72 (3d Cir. 1996) (same).  Consistent with this clear line of precedent, the Court must find that § 922(g)(1) is an appropriate application of Congress's Commerce Clause powers.

\* \* \*

Since none of Dockery's arguments have merit, the Court denies his motion to dismiss his indictment.  An appropriate order will follow.